THE VILLAGE OF NILES *et al.*, Plaintiffs-Appellants, *v.* THE CITY OF CHICAGO, Defendant-Appellee.

First District (4th Division)   No. 78-2012

Opinion filed February 28, 1980.

Ancel, Glink, Diamond & Murphy, P. C., of Chicago (Louis Ancel, Ronald M. Glink, and John B. Murphey, of counsel), for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Robert Retke and Philip L. Bronstein, Assistant Corporation Counsel, of counsel), for appellee.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

This appeal involves an action brought by 47 suburban communities, on their behalf and on behalf of all 74 suburban municipalities within the Metropolitan Sanitary District of Greater Chicago, challenging the legality of the rates which defendant, city of Chicago, charges the suburbs for the purchase of water. Plaintiffs seek to enjoin the city from charging what are alleged to be unreasonable water rates and from discriminating against them and in favor of certain users residing within the city. In addition, plaintiffs seek to compel the city to account for over $26,000,000 in water charges collected under this rate structure. The circuit court of Cook County struck plaintiffs' first amended complaint, finding it failed to state a cause of action, and dismissed the lawsuit.

Plaintiffs contend on appeal that the first amended complaint states a cause of action showing that the city's metered water rates are unreasonable and discriminatory as applied to these suburban communities.

We reverse and remand.

The following facts are alleged in the first amended complaint. Prior to the year 1900, the city of Chicago obtained its water supply from Lake Michigan. The city also pumped most of its sewage into the lake, causing a serious pollution problem. In 1889, the legislature sought to remedy this problem by enacting "An Act to create sanitary districts * * *." (Ill. Rev. Stat. 1977, ch. 42, par. 320 et seq.) Since the sanitary district created by the Act included territory outside the city which was taxed for the district's operations, section 26 of the Act required the city to supply water to any incorporated community within the metropolitan sanitary district that requested such service and provided a pipeline to receive the water at the city limits. Ill. Rev. Stat. 1977, ch. 42, par. 348.

At the time of the adoption of the Act, Chicago had a classified rate for its water users that decreased as the volume of water consumption increased. Subsequently, the city eliminated the classified rate and adopted both a single-metered rate and an assessed, or flat-rate, water charge. Metered customers are charged on the basis of the measured volume of water supplied. The assessed customers are charged a fixed annual charge, calculated by the size and nature of the facility served.

The first amended complaint alleges that the 74 suburban municipalities, which are totally metered users, comprise a unique class. These suburbs and their residents represent approximately 27% of the entire population served by the city water system and total approximately 1,250,000 persons. As "wholesale" customers, the suburbs receive water

from the city at the city limits and distribute it through their own individual water distribution systems to their resident-consumers. The costs of the suburban distribution systems are in addition to the cost of the water supplied by the city, whereas the costs associated with intracity distribution are recovered as part of the city's water rates. The suburbs must install all of the metering and water control equipment according to city specifications, maintain specified reservoir capacities, and receive their water supplies from the city at a uniform rate of flow.

The suburbs purchase about 18% of all water distributed by the city water system. This percentage amounts to approximately 161,000,000 gallons of water every day. In contrast, of some 504,000 water connections within the city proper, only 157,000 connections are metered and charged the same single-metered rate as the suburban communities. The remaining 347,000 connections in the city are not metered. At least 50% of the total water supplied by the city system, or in excess of 500 million gallons per day, is unmetered. In 1975, the per-capita consumption of water in the city was 250 gallons per day, compared to 139 gallons per day in the suburbs. As a result, the effective rate per 1,000 gallons of water used within the city is lower than the metered rate charged the suburban users.

The first amended complaint charges that the metered rates adopted by the city are illegal as applied to the 74 suburbs for the following reasons. The suburbs, while purchasing about 18% of the water pumped by the city, account for approximately 27% of the city's total water revenue. This compares to the unmetered intracity customers, who produce approximately 21% of the city's total water revenue, while unmetered water accounts for in excess of 50% of the total water supplied by the system. Based on the city's cost figures for October 1973 through December 1976, plaintiffs estimated that the water rate paid by the suburbs was approximately 60% more than the cost of servicing the suburbs with water for this same period. The revenue per 1,000 gallons produced by the suburbs was about 81% higher than the revenue per 1,000 gallons produced by the Chicago unmetered or flat-rate customers, and about 36% above the average revenue per 1,000 gallons for all customers, both metered and unmetered, within the city limits.

It costs the city approximately $7,000,000 a year to deliver, meter, bill and collect for all of the water served by its system. An estimated 98% of these costs are attributable to the 504,000 connections representing customers living within the city itself. This entire expense, however, is an element of the water rates charged both city and suburban customers, although the city does not incur a similar expense for water distributed to individual consumers served by the suburban distribution systems.

The city has an excess pumping capacity of 1,500,000,000 gallons a

day. One of the primary reasons for this standby capacity is to insure adequate fire protection for the people and property in the city. In addition, there are approximately 46,000 fire hydrants in the city which cost in excess of $3,500,000 per year to maintain. These costs, attributable to intracity fire protection, are recovered from the water rates which the suburbs must also pay. The suburbs, however, maintain their own fire departments and fire hydrants.

Another element of cost figured into the water rates relates to the maintenance of the city sewer system. The first amended complaint alleges that certain payments made by the city water department to the city's corporate general fund are improper charges for the maintenance of the city sewer system and are of no benefit to the suburbs. It also alleges that the city gives away over $5,000,000 worth of water every year to various municipal, religious, charitable, educational, State and county facilities located within the city while the suburbs must pay for all water distributed to similar institutions located within their communities.

For these reasons, plaintiffs allege that the charges and rates, as set by city ordinance in 1973 and 1976[1], discriminate against the suburbs in violation of the equal protection clauses of the State and Federal constitutions (Ill. Const. 1970, art. I, §2; U.S. Const., amend. XIV), and, further, that these charges and rates, as applied to the suburbs, are arbitrary and unreasonable in violation of section 26 of "An Act to create sanitary districts * * *" (Ill. Rev. Stat. 1977, ch. 42, par. 348).

The suit seeks to enjoin the city from discriminating against the suburbs in favor of the users residing within the city limits, a reduction of approximately $10,000,000 in their annual water rates and a recovery of over $26,000,000 in allegedly illegal water charges from 1974 to date.

The trial court, without hearing any evidence and on the motion of the city to strike and dismiss for failure to state a cause of action, entered an order on September 28, 1978, striking the first amended complaint and dismissing the lawsuit. This appeal is taken from that order.

OPINION

In 1852, pursuant to State statute, the city of Chicago purchased the Chicago Hydraulic Company and entered into the business of owning and operating a system of waterworks for the city and its inhabitants. (Ill. Rev. Stat. 1977, ch. 24, par. 11—124—1 et seq.) The city is empowered to make all needful rules and regulations "for the construction, completion,

---

[1] In October of 1973, the city passed an ordinance which increased the assessed water rate by about 34% and the net metered rate by about 37%. In December of 1976, the city passed an ordinance, effective January 1, 1977, which increased the assessed water rate by about 21% and which increased the net metered water rate from 37.8 cents per 1,000 gallons to 45.7 cents per 1,000, or approximately a 21% increase.

management or control of the waterworks, and for the fixing and collecting of such water rates or rents as the corporate authorities may deem necessary and expedient." (Ill. Rev. Stat. 1977, ch. 24, par. 11—125—3.) Pursuant to this statutory authority, the city has enacted ordinances establishing a schedule of water rates for both metered and flat-rate water users of the water it supplies. (Municipal Code of Chicago 1977, ch. 185, pars. 185—26 and 185—31.) In this action, plaintiffs challenge rates established by city ordinance in 1973 and 1976.

After "An Act to create sanitary districts * * *" was enacted in 1889, the city became an extraterritorial supplier of water. Under section 26 of this act, the city is allowed to provide water from Lake Michigan to any municipality within 35 miles of its borders and the city is *required* to supply lake water to any municipality within the geographical boundaries of the Metropolitan Sanitary District of Greater Chicago if that community constructs a pipeline to the borders of the city to receive the water. Plaintiffs and the suburbs they seek to represent are all within the category of municipalities located within the metropolitan sanitary district and receive water from the city pursuant to this statutory provision. The residents of these suburban communities historically have been subject to taxes levied by the metropolitan sanitary district, "the object of which has been to turn the sewage of Chicago and its suburbs away from Lake Michigan * * *." *City of Chicago v. Town of Cicero* (1904), 210 Ill. 290, 300, 71 N.E. 356, 360.

It is apparent from the record in this case that the trial court dismissed plaintiffs' action based on its interpretation of the following paragraph of section 26:

"Any city, village or incorporated town located in any such sanitary district which owns a system of waterworks and procures its supply of water from a lake or other source which will be saved from sewage pollution by the construction of the sewage facilities provided by this Act shall furnish water to any city, village, township, incorporated town or other municipal corporation within the boundaries of any such sanitary district in such quantities as may be required to supply consumers within said territory *at no greater price or charge than said city, village or incorporated town charges and collects of consumers within its limits through meters for like large quantities*; provided, however, that any such city, village, township, incorporated town or other municipal corporation making application for the sale of water to it shall be required to build or cause to be built suitable and sufficient water mains to the corporate limits of such city, incorporated town or village so owning a system of waterworks

and supplying water as aforesaid to connect with the water mains and receive the water from such city, incorporated town or village." (Emphasis added.)

Since it was not disputed by plaintiffs that the 74 suburban communities pay the same metered rate as metered intracity users, the trial court accepted the city's argument that as long as the suburban users pay "no greater price or charge than said city * * * collects of consumers within its limits through meters for like large quantities," the judiciary should not inquire further into the reasonableness of the rates charged. On this basis the trial court dismissed plaintiffs' action, and we believe this was error.

We disagree with the city's position that the suburbs are entitled to judicial review of the city water rates *only* if the rates charged the suburbs exceed the price charged metered intracity users. Section 26 does not state that the rates charged the suburban metered users must be the same as those charged intracity metered users of like large quantities, but sets a ceiling on the water rates that may be charged the suburbs by stating that the price can be no greater. Thus, under section 26, the fact that the suburban customers are charged the same rate as metered intracity users does not establish that the rates are *per se* reasonable and nondiscriminatory.

■■ Language employed by the Illinois Supreme Court in construing section 26 supports plaintiffs' contention that the rates charged the suburbs must not only be no greater in price than those charged metered city users, but must also be reasonable. In *City of Chicago v. Town of Cicero* (1904), 210 Ill. 290, 71 N.E. 356, the court affirmed a circuit court order awarding a writ of mandamus to compel the city of Chicago to furnish water to the town of Cicero according to the terms of section 26. In rejecting the city of Chicago's argument that requiring it to provide water to neighboring Cicero would amount to a taking of city property without just compensation, the court commented on the nature of the compensation the city would receive from the sale of its water to Cicero.

"This makes it necessary to inquire, who is to fix the rate that the town of Cicero is to pay? It is fixed by the ordinances of the city of Chicago, and *the only limitation upon the right of the city in that respect is, that it shall be a reasonable rate and no greater than that charged to other consumers.* If it could be fixed by a jury and was fixed by them at a higher rate than this, the verdict would be set aside. The position of the city is, that this statute cannot stand because it does not provide for a tribunal to fix the compensation which the city is to receive for the water furnished, when the right to fix the compensation is left with the city itself. It would seem that he who is permitted to fix his own price is not injured by the

failure of a statute or provide that the price should be fixed by another.

The suggestion that the view which the court has adopted may lead to the bankruptcy of the city is without weight. *The city is warranted in charging a reasonable rate for this water, which must be uniform among all large water takers. A reasonable rate, considering the city now in its business capacity aside from its governmental capacity, would at least be such a rate as would repay to the city all the expense of furnishing the water.*" (Emphasis added.) 210 Ill. 290, 303-04, 71 N.E. 356, 361.

It can be gathered from this language that the court contemplated the imposition of a reasonable rate which would fully compensate the city for the costs of servicing the suburban water users. Indeed, at common law, the standard of reasonableness has always been applied in evaluating the utility rates charged by municipal corporations acting in their proprietary capacities. See McQuillin, Municipal Corporations §35.37a, at 483-84 (3d ed. 1970).

The gist of the action is plaintiffs' allegation that the rate charged the suburban users is discriminatory and unreasonable. Plaintiffs argue that they are a unique class of water users and that, although they pay the same rate as metered intracity users, as to them the rate is disproportionately high in relation to the cost of serving the suburbs and the services they receive. This is a constitutional challenge, and it is fundamental that a statute should be read in consonance with constitutional principles (*Arnolt v. City of Highland Park* (1972), 52 Ill. 2d 27, 282 N.E.2d 144), and, where possible, as declaratory of the common law (*Berlin v. Nathan* (1978), 64 Ill. App. 3d 940, 381 N.E.2d 1367; *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 326 N.E.2d 74). Thus, if plaintiffs can plead and prove that the city water rates have an unreasonably discriminatory effect as applied to them, section 26 should not be read to impair their right to relief.

Indeed, the city appears to concede this point on appeal by stating, in its discussion of the opinion of the court in the *Town of Cicero* case, "the court was espousing long established common law principles that water rates established by a municipality must conform to constitutional standards and are subject to judicial review on those grounds." For this reason, we cannot say that the language of section 26 prohibits judicial inquiry into the reasonableness of the rates charged.

Finding that the application of section 26 does not *per se* bar plaintiffs' cause of action, we must examine the sufficiency of the complaint in light of certain fundamental principles. A motion to dismiss admits all well-pleaded factual allegations (*Steinberg v. Chicago Medical*

*School* (1977), 69 Ill. 2d 320, 371 N.E.2d 634; *O'Fallon Development Co. v. City of O'Fallon* (1976), 43 Ill. App. 3d 348, 356 N.E.2d 1293), but it does not admit conclusions of law, the pleader's construction of a statute, or conclusions of fact unsupported by allegations of specific fact upon which such conclusions rest (*Cain v. American National Bank & Trust Co.* (1975), 26 Ill. App. 3d 574, 325 N.E.2d 799). A complaint should not be dismissed unless it clearly appears that no conceivable set of facts could ever be proved entitling plaintiffs to the relief sought. (*Phillips Construction Co. v. Muscarello* (1976), 42 Ill. App. 3d 151, 355 N.E.2d 567; *Matchett v. Rose* (1976), 36 Ill. App. 3d 638, 344 N.E.2d 770.) "No pleading is bad in substance which contains such information as reasonably informs the opposite party of the nature of the claim or defense which he is called upon to meet." Ill. Rev. Stat. 1977, ch. 110, par. 42(2).

■■ ■ Well-established common law tenets of utility law must also be considered. A municipality, such as the city, which sells water, does so in a proprietary rather than in a governmental capacity. (*Baltis v. Village of Westchester* (1954), 3 Ill. 2d 388, 121 N.E.2d 495.) The business of supplying water belongs to that class of enterprises upon which the public interest is impressed. (*City of Chicago v. Northwestern Mutual Life Insurance Co.* (1905), 218 Ill. 40, 75 N.E. 803.) The city is subject to the same rules that would apply to a privately owned utility (*Conner v. City of Elmhurst* (1963), 28 Ill. 2d 221, 190 N.E.2d 760), including those forbidding unreasonableness and discrimination in utility rates (*Springfield Gas & Electric Co. v. City of Springfield* (1920), 292 Ill. 236, 126 N.E. 739, *aff'd* (1921), 257 U.S. 66). On the other hand, the city is not prohibited from realizing a reasonable revenue surplus or profit from the operation of the system. *Wagner v. City of Rock Island* (1893), 146 Ill. 139, 34 N.E. 545.

■■ The city's rates must be to a certain extent uniform, reasonable and just for the same amount and character of service. (*Springfield Gas & Electric Co. v. City of Springfield* (1920), 292 Ill. 236, 126 N.E. 739.) Where utility service is provided by a municipality, the rule prohibiting unreasonable discrimination also applies. (*Conner v. City of Elmhurst* (1963), 28 Ill. 2d 221, 190 N.E.2d 760.) Nevertheless, this does not require absolute uniformity of rates nor forbid all discrimination, only discrimination that is arbitrary and without a reasonable factual justification. *Wagner v. City of Rock Island* (1893), 146 Ill. 139, 34 N.E. 545.

■■ Although municipally owned utility systems are self-regulating, their rates are subject to review by the courts. (*Springfield Gas & Electric Co. v. City of Springfield* (1920), 292 Ill. 236, 126 N.E. 739; *Conner v. City of Elmhurst* (1963), 28 Ill. 2d 221, 190 N.E.2d 760.) In *Springfield Gas &*

*Electric Co. v. City of Springfield* (1920), 292 Ill. 236, 126 N.E. 739, the supreme court, in holding that municipally owned utilities were not subject to rate regulation by the Public Utilities Commission, stated: "Municipal officers * * * cannot discriminate in rates or make exorbitant and unjust rates to consumers * * *. All their rates and charges fixed by ordinances or resolutions are subject to review by the courts * * *." 292 Ill. 236, 253, 126 N.E. 739, 746.

Here, plaintiffs contend that the 74 suburban communities are a unique class of water users and that the rates charged them are unreasonable and, therefore, discriminatory. This contention is not based solely on the extraterritorial location of the suburbs in relation to the city, but on alleged differences in the needs and costs of serving the suburban communities. The complaint alleges that the 74 suburbs are wholesale purchasers of water, which resell the water to their resident-consumers. The suburbs provide and must bear the cost of water systems to distribute the water received from the city to their suburban residents. The suburbs must install all of the metering and water control equipment according to city specifications, maintain specified reservoir capacities, and receive their water supplies from the city at a uniform rate of flow. The customers served by the suburbs are approximately 27% of the entire population reached by the city water system and the suburbs purchase 18% of all water pumped by the city system.

In comparison, the metered water users within the city are individual retail customers served directly by the city water distribution system. Only 157,000 of 504,000 water connections are metered, encouraging increased water consumption within the city limits and a lower per gallon cost to most intracity users.

In support of their contention that these disparate characteristics are sufficient to establish plaintiffs as a separate class of water users, plaintiffs cite *City of St. Charles v. Illinois Commerce Commission* (1961), 21 Ill. 2d 259, 172 N.E.2d 353. In that case, five cities appealed from a trial court order confirming an order of the Illinois Commerce Commission which allowed an increase in rates for electric service to them from the Commonwealth Edison Company. The five cities and 11 other customers of Edison purchased electricity for resale to the consumers within their respective service areas. The five cities alleged that they were a class of customers separate from the other 11 customers and that it was unreasonably discriminatory to serve them on the same rate classification with the other 11 resellers.

Ten of the other 11 reselling customers had substantially smaller demands than the five cities and were either submetering landlords, owners of apartment houses, stores and hotels, or similar businesses. One of the 11 was an institution. The average load factor was higher for the

five cities than for 10 of the 11 other customers, and the cities had substantially larger demands than the other reselling customers, making the unit cost of service to the five cities lower than the unit cost to the other 11 customers.

The court in *City of St. Charles* agreed with the plaintiffs' contention that the five cities were entitled to a measurably lower charge for electric energy than the charge to the other 11 resellers, but went on to conclude that the block pricing structure of the rate classification, which decreased the cost of the electricity as demand increased, compensated for the differences in demand between the five cities and the 11 smaller customers. The court stated:

"The mere inclusion of customers with dissimilar characteristics and demands on the same rate classification does not result in any unreasonable prejudice or unlawful discrimination against such customers if there are differences in the charges within the class which properly give effect to such dissimilarities." (21 Ill. 2d 259, 266, 172 N.E.2d 353, 356.)

In conclusion, the court stated:

"We are of the opinion that the five cities have not met the burden of showing that the differences between the charges to these groups of customers are unduly prejudicial or otherwise unreasonable." 21 Ill. 2d 259, 266, 172 N.E.2d 353, 357.

■ We believe the *City of St. Charles* case stands for the proposition that grouping customers with disparate characteristics under the same utility rate may render that rate unreasonably discriminatory. Measured against this case, the allegations in plaintiffs' first amended complaint are sufficient to establish, for purposes of the motion to dismiss, that the suburbs are a unique class of users, and it raises a factual question as to whether charging the 74 suburbs the same rate as intracity metered users is unreasonable.

The city argues that the requirements of each of the 74 suburban communities are different, and, similarly, that metered city users such as high-rise buildings may in fact have larger requirements than the suburbs. These arguments may be valid, but they merely raise questions of fact that are subject to proof at trial. Since the properly pleaded factual allegations of plaintiffs' first amended complaint must be taken as true on a motion to dismiss, these factual arguments have no bearing on the sufficiency of the pleading before us.

Additionally, cases cited by the city in support of its position that the rates charged the suburbs are reasonable involve determinations made at the end of evidentiary hearings and are based on the particular facts of the respective cases. (See *Campbell v. Water Works & Sanitary Sewer Board* (1959), 270 Ala. 33, 115 So. 2d 519; *Mitchell v. City of Mobile*

(1943), 244 Ala. 442, 13 So. 2d 664.) These cases recognize the general rule that rates established by publicly owned utilities must be reasonable and thus not discriminatory. In *Wagner v. City of Rock Island* (1893), 146 Ill. 139, 34 N.E. 545, another case relied on by the city, the court specifically stated that the complaint under its consideration did not allege any unfairness in the rates or "proceed upon the theory that there is any inequality or improper discrimination * * *." 146 Ill. 139, 151, 34 N.E. 545, 547.

■■ We note that every discrimination is not unreasonable. However, whether or not a rate is unreasonable is generally a question of fact. (See *Conner v. City of Elmhurst* (1963), 28 Ill. 2d 221, 190 N.E.2d 760.) A presumption of validity is accorded the rates enacted by city ordinance, and plaintiffs bear the heavy burden of proving that the rates charged are unjustly discriminatory and unreasonable. (See *Russell v. City of Pacific Grove* (1975), 54 Cal. App. 3d 53, 126 Cal. Rptr. 371.) Thus, plaintiffs must not only prove that they are a separate class of customers, but must also establish that the rates fixed by ordinance in 1973 and 1976 were and are unreasonable as applied to them.

■■ Keeping in mind the present posture of the lawsuit, being based solely on the sufficiency of the first amended complaint, we find that the facts alleged therein entitle plaintiffs to an evidentiary hearing. The complaint alleges, *inter alia*, the city's rates, the costs of serving the suburbs and city users, the disparity in revenues produced through these rates, the disparity in services and benefits received therefor, the facts showing that the suburbs comprise a unique class of water user within the system, the improper charge by the city for unrelated city services and general governmental expenses as water expenses to be recovered through water rates paid by plaintiffs, and the discriminatory effect of various city practices on the suburbs.

The law recognizes a right in plaintiffs to be charged a nondiscriminatory and reasonable rate which the complaint seeks to preserve. Applying the liberal construction to which such pleadings are entitled, we hold that the first amended complaint states a cause of action.

For these reasons, the judgment of the circuit court of Cook County is reversed and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

JOHNSON and ROMITI, JJ., concur.