ROBERT F. PERRIN, Ex'r of the Estate of Margaret F. Perrin, Deceased, *et al.*, Plaintiffs-Appellants, *v.* PIONEER NATIONAL TITLE INSURANCE COMPANY, Defendant-Appellee.

First District (2nd Division)    No. 79-218

Opinion filed April 22, 1980.

Sudak, Grubman, Pritikin, Rosenthal and Feldman, of Chicago (Alan E: Sohn, of counsel), for appellants.

Jenner & Block, of Chicago (Joseph G. Bisceglia, of counsel), for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiffs, Robert F. Perrin, executor of the estate of Margaret F. Perrin, deceased, and Phillip Malvin, Recille Malvin, Raymond P. Logan, and Alicia P. Logan, appeal from the judgment of the circuit court of Cook County entered in favor of defendant, Pioneer National Title Insurance Company, upon allowance of defendant's motion to dismiss plaintiffs' amended complaint. The only issue is whether the amended complaint states a cause of action under section 2 of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1977, ch. 121½, par. 262).

Plaintiffs, suing individually and on behalf of a class of persons similarly situated, alleged in their amended complaint that plaintiffs Malvin and Perrin, as sellers of real estate, and plaintiffs Logan, as purchasers of real estate, purchased owner's title and mortgage insurance policies from defendant. Plaintiffs sought to represent a class of persons who either sold or bought real estate in Illinois from October 1, 1973 (the effective date of the amended act), to date; who ordered title reports and commitments for title and mortgage insurance policies from defendant in connection with the transactions; and who paid defendant in accordance with charges imposed by defendant for its services. Plaintiffs alleged that during the period in question, defendant made and published a schedule of customary charges for its title insurance services based upon the amount of title insurance involved in a particular transaction. However, during the same period defendant allegedly granted builders, developers, contractors, and others engaged in the business of real estate development (builders), substantial discounts, which discounts were disproportionate and unrelated to any purported economy or saving inuring to defendant by reason of obtaining the business of such builders. Plaintiffs alleged that the services obtained by plaintiffs were the same as or substantially similar to those obtained by builders, but the charges to plaintiffs were based upon the aforesaid customary schedule of charges and, as a result, were 300% to 400% higher. Plaintiffs alleged that "said

discriminatory, unjust and oppressive practice engaged in by the defendant" constituted an unfair trade practice in violation of section 2 of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1977, ch. 121½, par. 262). Attached to plaintiffs' amended complaint were invoices from defendant reflecting "buyer's charges (customarily)" and "seller's charges (customarily)" in connection with the title services furnished to plaintiffs. Plaintiffs Malvin and Perrin paid the full amount of the customary seller's charges while plaintiffs Logan paid the full amount of the cutomary buyer's charges, all without knowing that these charges were substantially in excess of the charges made by defendant to builders for substantially similar services. Plaintiffs alleged that "as a consequence of such unfair, unreasonable and discriminatory pricing practices," the charges to plaintiffs for title insurance services "have been and are oppressive, unjust and extremely injurious" to plaintiffs' class, and they have sustained damage by being required to pay "inflated, unreasonable, unfair and unnecessarily excessive" prices for defendant's services. Plaintiffs requested injunctive relief, an accounting, and other relief.

In count II of their amended complaint (which restated what was the only claim in their original complaint), plaintiffs additionally alleged that defendant "intentionally concealed and suppressed such unfair trade practice" from plaintiffs' class, "and/or otherwise misrepresented * ° * that the charges for defendant's services were based upon a customary schedule of charges which applied uniformly and proportionately to the services rendered by defendant to all customers of defendant, including 'builders.' " The trial court dismissed plaintiffs' amended complaint with prejudice for failure to state a cause of action; plaintiffs have appealed.

Section 2 of the Consumer Fraud and Deceptive Business Practices Act, as amended by Pub. Act 78-904, §1, effective Oct. 1, 1973, provides:

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been mislead [sic] deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." (Ill. Rev. Stat. 1977, ch. 121½, par. 262.)

Section 1(f) of the Act defines "trade" and "commerce" to include *inter*

*alia* "the advertising, offering for sale, sale, or distribution of any services * * *" (Ill. Rev. Stat. 1977, ch. 121½, par. 261(f)), while section 10a of the Act provides:

"Any person who suffers damage as a result of a violation of Sections 2 through 2N of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper." (Ill. Rev. Stat. 1977, ch. 121½, par. 270a.)

Section 2 of the Uniform Deceptive Trade Practices Act, to which the above-quoted section 2 of the Consumer Fraud and Deceptive Business Practices Act refers, provides in pertinent part:

"A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:

 * * *

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." (Ill. Rev. Stat. 1977, ch. 121½, par. 312(12).)

Finally, section 5(a) of the Federal Trade Commission Act provides in pertinent part:

"Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." 15 U.S.C. §45(a)(1)(1976).

Plaintiffs' position on appeal may best be understood in the context of another case involving title services under the Consumer Fraud Act, *Fitzgerald v. Chicago Title & Trust Co.* (1977), 46 Ill. App. 3d 526, 361 N.E.2d 94, *aff'd* (1978), 72 Ill. 2d 179, 380 N.E.2d 790. In *Fitzgerald*, the plaintiffs were buyers and sellers of real estate who purchased title insurance from Chicago Title & Trust (CT&T) through the institutions which financed their transactions. CT&T submitted to the financing institutions invoices reflecting customary buyer's and seller's charges which did not disclose that CT&T paid "a rebate, discount or allowance" of 10% of the charges to the financing institutions, for which the plaintiffs, who paid the amounts shown on the invoices, were not reimbursed. The issue was whether these allegations stated a cause of action against the title company under section 2 of the Consumer Fraud and Deceptive Business Practices Act.

The appellate court, noting that section 2 recommends that it be construed in light of FTC and Federal court interpretations of section 5(a) of the FTC Act, stated that the court would consult Federal authorities where there was a lack of Illinois precedent. After determining that under the Federal cases the Clayton Act (15 U.S.C. §§12-27 (1976), as amended by the Robinson-Patman Act) is read *in pari materia* with section 5(a) of

the FTC Act, and noting that even practices which violate neither the letter nor the spirit of the antitrust laws may nevertheless violate section 5(a) (citing *Federal Trade Com. v. Sperry & Hutchinson Co.* (1972), 405 U.S. 233, 31 L. Ed. 2d 170, 92 S. Ct. 898, discussed *infra*), the court found that the practice complained of constituted conduct found to be an unfair trade practice under section 2(c) of the Clayton Act. That section provides:

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid." (15 U.S.C. §13(c)(1976).)

Although the Seventh Circuit Court of Appeals had held that identical payments by CT&T did not violate section 2(c), for the reason that the Clayton Act itself does not apply to intangibles such as insurance (*Freeman v. Chicago Title & Trust Co.* (7th Cir. 1974), 505 F.2d 527), the appellate court held that CT&T's conduct nevertheless violated our Consumer Fraud and Deceptive Business Practices Act, which explicitly applies to the sale of "any services and any property, tangible or intangible" (Ill. Rev. Stat. 1977, ch. 121½, par. 261(f)). This the court held even though CT&T's conduct also would not have been actionable at common law. 46 Ill. App. 3d 526, 528-29, harmonizing *Janes v. First Federal Savings & Loan Association* (1974), 57 Ill. 2d 398, 312 N.E.2d 605 (which held, however, that the rebates were recoverable from the financing institutions).

The supreme court affirmed (72 Ill. 2d 179, 380 N.E.2d 790) the appellate court's decision, but on a different basis. The court stated the appellate court correctly looked to Federal authorities where there was a lack of Illinois precedent, but cautioned that section 2 of the Consumer Fraud and Deceptive Business Practices Act should not be construed to mean that every violation of the Clayton Act is an unfair or deceptive practice under the Illinois statute. (72 Ill. 2d 179, 184.) The court further found that the appellate court did not err in holding the payment of the rebates could be an unfair or deceptive act or practice, even though such conduct was not actionable at common law under *Janes* or as a violation of the Clayton Act under *Freeman*. (72 Ill. 2d 179, 186-87.) The *Fitzgerald* court then noted that the plaintiffs were contending in the supreme court

that the conduct complained of stated a cause of action under the plain language of section 2 of the Consumer Fraud and Deceptive Business Practices Act, even without regard to the Federal authorities. Accordingly, in an analysis that closely tracked the language of statute, the court found that if CT&T's actions in sending the invoices without disclosing the rebates were taken with the intent that others rely upon the failure to disclose, and the plaintiffs did rely by paying charges they might have been able to recoup from the financing institutions as their agents, the complaint stated a cause of action under section 2 of the Consumer Fraud and Deceptive Business Practices Act.

In the case at bar, plaintiffs' arguments in support of count I of their amended complaint are patterned after the reasoning of the appellate court in *Fitzgerald*, while count II is based more closely on the language of the statute, as was the supreme court's analysis in that case. As to count I, plaintiffs argue that defendant's practice of giving disproportionate discounts to builders amounts to discriminatory pricing. Section 2(a) of the Clayton Act (15 U.S.C. §13(a)(1976), as amended by the Robinson-Patman Act) provides in part:

> "It shall be unlawful for any person engaged in commerce * * * to discriminate in price between different purchasers of commodities of like grade and quality * * * where the effect of such discrimination may be substantially to lessen competition * * * or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost * * * resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered * * *."

Plaintiffs alternatively contend that the discounts represent unlawful discounts in lieu of brokerage in excess of services rendered, referring to section 2(c) of the Clayton Act (15 U.S.C. §13(c)(1976)), the section relied upon by the appellate court in *Fitzgerald* and quoted above.

■■■ Defendant argues that these sections prohibit price discrimination either directly (under section 2(a)) or indirectly through manipulation of brokerage commissions (under section 2(c)), but generally only among those competing in the resale of the products purchased. This is in accord with the fundamental purpose of the Clayton Act as amended in 1936 by the Robinson-Patman Act, to ensure that one merchant in the business of selling goods will not be forced to pay a higher price for goods than a competitor, enabling the competitor to undersell him and drive him out of business. (See generally F. Rowe, Price Discrimination Under the Robinson-Patman Act 1-23 (1962).) Thus, section 2(a) is limited by its

terms to situations where price discrimination may "lessen * * *, injure, destroy, or prevent competition," and the cases cited by plaintiffs under section 2(a) all deal with such situations. (See *Federal Trade Com. v. Morton Salt Co.* (1948), 334 U.S. 37, 92 L. Ed. 1196, 68 S. Ct. 822 (salt manufacturer selling to large retailers at discounts allegedly not justified by the diminished costs resulting from the volume of their purchases, thus enabling them to undersell their smaller competitors); *Thomasville Chair Co. v. FTC* (5th Cir. 1962), 306 F.2d 541 (remanding for determination whether furniture manufacturer's sale to large furniture distributors at a higher discount than given smaller distributors was justified by cost savings); *Hartley & Parker, Inc. v. Florida Beverage Corp.* (5th Cir. 1962), 307 F.2d 916 (beverage producer selling to one wholesaler-distributor at lower prices than those charged to a competing wholesaler-distributor).) Plaintiffs have not alleged in their complaint that they are in competition with builders in the sale of homes nor, in view of the fact that the cost of title insurance is minimal in relation to the price of a home, is it clear that such an allegation would make any difference. As to section 2(c), the case cited by plaintiffs similarly involved price discounts that gave certain retailers a competitive advantage over other retailers, only disguised in the form of reduced broker's commissions. (See *FTC v. Washington Fish & Oyster Co.* (9th Cir. 1960), 282 F.2d 595.) While section 2(c) does not by its terms require an anticompetitive effect, therefore lending more justification to its transfer to the consumer area (see *Fitzgerald v. Chicago Title & Trust Co.* (1977), 46 Ill. App. 3d 526, 361 N.E.2d 94, discussed in *Evanston Motor Co. v. Mid-Southern Toyota Distributors, Inc.* (N.D. Ill. 1977), 436 F. Supp. 1370, 1374-75 & nn.4, 6; but see *Fitzgerald v. Chicago Title & Trust Co.* (1978), 72 Ill. 2d 179, 184, 380 N.E.2d 790 (not every violation of section 2(c) is a violation of the Consumer Fraud Act)), the section simply does not apply to straightforward discounts not disguised as brokerage commissions, thus bringing us back to section 2(a). (*Lupia v. Stella D'Oro Biscuit Co.* (7th Cir. 1978), 586 F.2d 1163, 1170, *cert. denied* (1979), 440 U.S. 982, 60 L. Ed. 2d 242, 99 S. Ct. 1791.) Although plaintiffs have alleged that the discounts granted to builders are disproportionate to any cost savings generated by the volume of the builders' business, they have not alleged an anticompetitive effect, and therefore plaintiffs' attempt to state a cause of action by reference to the Clayton Act must fail.[1]

However, plaintiffs point out that the FTC is empowered to define

---

[1] Defendant also maintains that even where section 2(a) applies, it does not prohibit price differentials to purchasers at different economic levels and in different markets, such as *wholesalers* as against retailers or distributors as against consumers. However, whether builders and consumers are at the same level as consumers of title services, and whether this problem could properly be resolved on a bare motion to dismiss, are questions we need not decide.

and proscribe as unfair or deceptive, practices which infringe neither the letter nor the spirit of the antitrust laws, and which injure only consumers and have no effect upon competition. (See *Federal Trade Com. v. Sperry & Hutchinson Co.* (1972), 405 U.S. 233, 31 L. Ed. 2d 170, 92 S. Ct. 898.) Thus in the leading case, *Federal Trade Com. v. R.F. Keppel & Bro.* (1934), 291 U.S. 304, 78 L. Ed. 814, 54 S. Ct. 423, the Supreme Court held that a candy marketing method which had the effect of tempting children to gamble could be prohibited as unfair, even though it was otherwise lawful and could be imitated by competitors, because the practice was "shown to exploit consumers, children, who are unable to protect themselves" and because it was contrary to public policy. (291 U.S. 304, 313, 78 L. Ed. 814, 819, 54 S. Ct. 423, 426-27.) Following *Keppel*, the FTC Act was amended to add the phrase "unfair or deceptive acts or practices" to section 5's original ban on "unfair methods of competition," thus making it clear "that Congress, through §5, charged the FTC with protecting consumers as well as competitors." (*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, 31 L. Ed. 2d 170, 179, 92 S. Ct. 898, 905.) The court in *Sperry & Hutchinson* then set out the standards employed by the FTC

"\* \* \* in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair:

'(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " (405 U.S. 233, 244-45 n.5, 31 L. Ed. 2d 170, 179 n.5, 92 S. Ct. 898, 905 n.5, citing 29 Fed. Reg. 8355 (1964).)

Whether satisfaction of just the third criterion, substantial injury to consumers, would be sufficient to render a practice unfair remains unclear. (But see 405 U.S. 233, 244-45 n.5, 31 L. Ed. 2d 170, 179 n.5, 92 S. Ct. 898, 905 n.5.) Thus, in *Spiegel, Inc. v. FTC* (7th Cir. 1976), 540 F.2d 287, the court upheld the power of the FTC to prevent a large mail order house from suing out-of-State customers for delinquent credit accounts in Illinois. Stating that there was "no doubt that the FTC had the authority to prohibit conduct that, although legally proper, was unfair to the public" (540 F.2d 287, 292), the court agreed that the FTC could ban the practice so long as the FTC determined that it "violated public policy and was injurious to consumers." 540 F.2d 287, 293.

A leading State court case that reached a similar result in construing a

State consumer protection statute which, like our own, is modeled in part after the FTC Act, is *Commonwealth v. DeCotis* (1974), 366 Mass. 234, 316 N.E.2d 748. There, the operators of a mobile home park imposed a service charge or resale fee whenever a mobile home within the park was sold by its owner, although in fact they rendered no services. They were able to collect the fees because it was financially preferable for the tenants to sell their homes "on site" at fair market value less the fee than to sell the homes for relocation. The court held that even if the fee was fully disclosed to prospective tenants and the practice was industry wide and not otherwise unlawful, the fact that the operators rendered no services and had the tenants at their mercy rendered the extraction of a fee unfair. 366 Mass. 234, 242-43, 316 N.E.2d 748, 754, citing *Kugler v. Romain* (1971), 58 N.J. 522, 545-47, 279 A.2d 640, 653-54 (New Jersey Consumer Fraud Act interpreted to permit the invalidation of consumer sales contracts where the value received was unconscionably disproportionate to the price paid, analogizing to section 2—302 of the Uniform Commercial Code); see generally Annot., 89 A.L.R.3d 399, 449 (1979).

As our supreme court recognized in *Fitzgerald*, just as Congress left the concept of fairness up to the FTC to define, so our legislature chose to frame the Consumer Fraud and Deceptive Business Practices Act in general terms so as to permit construction and implementation of the statute on a case-by-case basis. (72 Ill. 2d 179, 185-86.) And just as the legislative history of amendments to the FTC Act confirmed the broad judicial reading of that statute, so too it has been held that the addition of a private right of action (section 10a) and a liberal construction rule (section 11a) to our act constituted a "clear mandate from the legislature to the courts of this State to utilize to the utmost degree the Consumer Fraud Act to eradicate all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers." *American Buyers Club v. Hayes* (1977), 46 Ill. App. 3d 270, 271, 361 N.E.2d 1383; see, *e.g., American Buyers Club v. Honecker* (1977), 46 Ill. App. 3d 252, 256-59, 361 N.E.2d 1370.

But the issue here, even assuming an expansive judicial power to define and prohibit practices as unfair, is whether plaintiffs' amended complaint alleges sufficient facts to show that the practice complained of is unfair. All that is alleged in this regard is that defendant grants builders substantial discounts, disproportionate to the cost savings generated by the volume of the builders' business, and this is injurious to consumers such as plaintiffs because they must pay a much higher price for similar services. Yet in the cases cited by plaintiff, the practices labeled unfair not only injured consumers, but offended some settled public policy, whether expressed in statutes, common law, or otherwise. (See also *Ortega v. Merit Insurance Co.* (N.D. Ill. 1977), 433 F. Supp. 135 (upholding, in a

civil rights action alleging price discrimination on the basis of race in the sale of credit property insurance, a count under the Illinois Consumer Fraud Act).) Other than the inapplicable section 2(a) of the Clayton Act, plaintiffs have cited no authority which has held or even implied that a seller is prohibited from charging different customers different prices, or from granting bigger discounts to volume buyers than cost savings alone would justify, even though this results in higher prices to consumers. Instead, it appears to be a legitimate business practice, designed generally to bring the volume buyer back in the future and, in this instance, apparently to place the builder's property in a particular title insurer's "stable" so that future title insurance policies on the property will likely be purchased through the same company.

■ Plaintiffs do not allege the business of title insurance is so affected with a public interest as to require title insurers to charge reasonable or nondiscriminatory rates. (Compare, *e.g.*, *Union Electric Co. v. Illinois Commerce Com.* (1979), 77 Ill. 2d 364, 396 N.E.2d 510 (public utilities); *Village of Niles v. City of Chicago* (1980), 82 Ill. App. 3d 60, 401 N.E.2d 1235 (municipality selling water).) Neither is it alleged that the practice complained of is the result of a conspiracy, combination, or anything but the competitive forces of a free market. Similarly, there is no allegation that plaintiffs or the class they seek to represent were or are foreclosed from choosing among competing title insurers, who, for all the complaint alleges, may or may not engage in the same practice. Defendant urges us to consider the "countless numbers of businesses" in which similar "price discrimination" among ultimate consumers is practiced, but suffice it to say that plaintiffs have failed to allege sufficient facts to show that defendant's conduct is unfair within the meaning of the Consumer Fraud and Deceptive Business Practices Act.

However, a question that could be raised is why plaintiffs' allegation of discriminatory pricing is not itself sufficient to shift to defendant the burden of denying any illegality and justifying the practice. In short, should not defendant have been required to file an answer and a motion for summary judgment, rather than a motion to dismiss? Plaintiffs argue that in cases under the Clayton Act, it need only be alleged (and proved) that the seller has charged one purchaser a higher price than another where both purchasers compete in the resale of the product purchased. The burden of justifying the differential by, for example, cost savings, then shifts to the defendant. (See 15 U.S.C. §13(b)(1976).) But this argument once again illustrates the need for caution in importing antitrust principles into the consumer area. The gist of a Clayton Act cause of action is the discriminatory pricing itself; it is presumed to have an anticompetitive effect, and therefore the burden of justification shifts to

the defendant. But for plaintiffs to have a cause of action under section 10a of the Consumer Fraud and Deceptive Business Practices Act, they must allege "damage as a result of a violation of Sections 2 through 2N of this Act" which proscribe, "unfair * * * acts or practices * * * in the conduct of any trade or commerce * * *." (Ill. Rev. Stat. 1977, ch. 121½, pars. 270a, 262.) If plaintiffs fail, as they have done here, to allege facts sufficient, if proved, to show that a pricing practice is unfair, plaintiffs have failed to state a cause of action and their complaint is subject to a motion to dismiss. To hold otherwise would be to require businesses to justify every price differential at the behest of any consumer who claimed it was unfair. We decline to take such a step in the absence of more explicit guidance from the legislature. Accordingly, we hold the trial court properly dismissed count I of plaintiffs' amended complaint for failure to state a cause of action.

In count II, plaintiffs alleged that defendant "intentionally concealed and suppressed" its practice of giving discounts to builders. But there is nothing alleged to show how that fact was in any way a "material fact" and thus to bring the alleged "concealment" within the proscription of section 2 of the Consumer Fraud and Deceptive Business Practices Act. (See Ill. Rev. Stat. 1977, ch. 121½, par. 262; see also *Rice v. Snarlin, Inc.* (1970), 131 Ill. App. 2d 434, 438-39, 266 N.E.2d 183.) In *Fitzgerald*, the defendant's failure to disclose the fact that a rebate was being paid was material, in that the plaintiffs were unnecessarily paying charges which they may have been entitled to recover from their agents, who were receiving the rebates. (*Fitzgerald*, 72 Ill. 2d 179, 188; see also *Browder v. Hanley Dawson Cadillac Co.* (1978), 62 Ill. App. 3d 623, 379 N.E.2d 1206.) In the case at bar, plaintiffs have not alleged that they would have done anything differently had they known of the builders' discounts, and thus the requisite materiality is lacking.

Plaintiffs' second count also charged that defendant "otherwise misrepresented * * * that the charges for defendant's services were based upon a customary schedule of charges which applied uniformly and proportionately to the services rendered by defendant to all customers of defendant, including 'builders.'" The source of this alleged misrepresentation, which plaintiffs now also contend "create[d] a likelihood of confusion or of misunderstanding" under section 2(12) of the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1977, ch. 121½, par. 312(12) incorporated in section 2 of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1977, ch. 121½, par. 262)), was not an actual "schedule of charges" but rather the designation of charges on defendant's invoices as "seller's charges (customarily)" and "buyer's charges (customarily)." The very meaning of the word "customarily" (*i.e.*, "usually") rebuts plaintiffs' contention that the charges were represented

as being uniformly the same for all customers, even if the invoices are taken as referring to the amount rather than the allocation of the charges. Neither can we discern any reasonable basis for the contention that the invoices "create[d] a likelihood of confusion or of misunderstanding" on this point. Thus, plaintiffs' attempt to state a cause of action in count II of their amended complaint also fails.

Accordingly, the judgment of the trial court dismissing plaintiffs' amended complaint is affirmed.

Affirmed.

PERLIN, P. J., and HARTMAN, J., concur.