THE VILLAGE OF NILES *et al.*, Plaintiffs-Appellants, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (4th Division) No. 1—87—1749

Opinion filed July 26, 1990.

654

Ancel, Glink, Diamond, Murphy & Cope, P.C., of Chicago (Marvin J. Glink, Robert K. Bush, David Lincoln Ader, and Stewart H. Diamond, of counsel), for appellants.

Kelly R. Welsh, Corporation Counsel, of Chicago (Ruth M. Moscovitch and Lynn Kristine Mitchell, Assistant Corporation Counsel, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiffs, 52 suburban municipalities that purchase water from the City of Chicago, brought suit for injunctive and other relief, challenging the water rates charged to them as being excessive, unreasonable, and discriminatory. After a trial consisting of 34 days of testimony over the course of one year, the trial court entered judgment denying plaintiffs the relief they sought and also denying Chicago relief based on its counterclaim.

On appeal, plaintiffs raise issues that may be broadly classified into those that attack Chicago's overall rate-making process and those that list certain, specific practices or charges to the suburbs that have

no corresponding benefit to the plaintiffs, such as sewer charges. They seek a refund of approximately $150 million from the city.

For the reasons that follow, we affirm on all issues except one, vacate in part, and remand for further proceedings.

BACKGROUND

The trial court's 72-page opinion sets forth extensive findings of facts and conclusions of law, which were fashioned after hearing live testimony, accepting substantial stipulations, and reviewing the lengthy briefs submitted by the parties in support of their respective positions. The appellate record in this case consists of thousands of pages of transcript in 11 boxes. To avoid an endless recitation of evidence, we will focus on the key points of dispute in the opinion section and set forth here only a brief outline of the facts.

In 1889 the Illinois legislature created the Sanitary District of Greater Chicago to protect the lake from sewage pollution and to provide the means by which communities that are included in the sanitary district may purchase their water supplies from Chicago, at rates no higher than those charged to its own, metered water users of "like large quantities of water." (Pertinent version of the act set forth in "An Act to create sanitary districts ***" (Act) (Ill. Rev. Stat. 1989, ch. 42, par. 320 *et seq.*).)

The Metropolitan Sanitary District of Greater Chicago (MSD) includes territory both within and outside the city, and owners of real property located within the MSD are taxed to fund the construction, operation, and maintenance of sewage facilities. The city sells purified water to the suburbs at metered rates that are the same as the rates charged to in-city residents who are metered. The metered customers in Chicago, however, comprise only a portion of total users, and the rest are charged water at an assessed or flat rate. In certain cases, users are not charged for their water service.

The suburban water users, including plaintiffs, contract with the city for the water they purchase in large bulk quantities. Chicago delivers the water at its corporate boundaries and each municipality is responsible for its own system of water mains that connect to the distribution point of Chicago's water mains. These municipalities then sell the water to their own residents, passing on their costs. Some of the municipalities also sell water they purchase from Chicago to other municipal corporations.

Since 1905, Chicago has used a single metered rate for all metered water users, regardless of the quantity of water consumed. In other words, there is no discounted rate for high-volume water pur-

chasers. All of the plaintiffs pay the current metered rate for their water.

The only other rate for water is a flat, assessed rate that applies to unmetered users. Where this rate applies, an individual user's consumption of water is not precisely measured.

Certain water users in Chicago receive free water, including city-owned buildings, churches, hospitals, educational facilities, and State and county facilities located in Chicago. The Chicago Park District has not paid for all of its water.

The pending lawsuit was initiated in 1977, when 47 suburban communities challenged the legality of the rates on behalf of themselves and all 74 municipalities that were part of the MSD at the time. Plaintiffs sought to enjoin Chicago from charging allegedly unreasonable water rates and from discriminating against them in favor of certain users residing in the city. The trial court dismissed plaintiffs' complaint for failure to state a cause of action. This court reversed the dismissal, however, holding that the allegations of the complaint did state a cause of action and remanding for a trial on the merits. *Village of Niles v. City of Chicago* (1980), 82 Ill. App. 3d 60, 401 N.E.2d 1235 (*Niles I*).

Much of the trial consisted of conflicting expert opinion testimony regarding the city's rate-setting methods. The dispute centers around the appropriate formula or methodology for analyzing and setting water rates for a municipally owned water system. Plaintiffs assert that the "utility basis" method employed by the city's experts improperly failed to consider total revenue requirements of the system, and also wrongly included a "fair value" component that includes the reproduction cost of the plant. Under the utility method, the municipality is allowed a reasonable return on its investment in the utility. Under the cash basis method, which plaintiffs argue should be used, the total revenue requirements on an annual basis are calculated, and then this total is allocated among various cost elements.

Plaintiffs further challenge certain practices, or what they consider "bad management" of the city, which they say resulted in their subsidizing other users in the system. These practices include Chicago's provision of free water to some users, transfers of money from the Chicago's water fund to the city's general corporate fund, and debt-collection procedures. Plaintiffs assert that all paying customers, in Chicago as well as outside, pay correspondingly higher prices when some customers pay nothing.

Plaintiffs further object to their past payment of sewer charges, as part of their water price, when they receive no sewer services

from the city. This charge is no longer included in the price to the suburbs, but they seek reimbursement for payments made over a period of years.

Plaintiffs assert that, as a class of wholesale customers, they are entitled to a discounted price for water, even though Chicago has a uniform rate system that does not allow for discounts based on wholesale or high volume use. They also contend that the trial court erred in refusing to certify the lawsuit as a class action. Finally, plaintiffs maintain that the trial court erred in holding that the water supply contracts they executed were not contracts of adhesion and were not void for want of consideration.

OPINION

Both sides apparently agree that the ultimate question is whether the rates charged the plaintiffs are reasonably related to the cost of service. Plaintiffs say the answer is no, because the rates they pay are inflated and unrelated to the actual costs of service to them, as a distinct class of water users. They would separate themselves from in-city users and expect to pay a lower rate, while Chicago would treat them the same as in-city water users whose consumption is metered.

██ Section 26 of the act to create sanitary districts only requires that the city charge the suburbs a "no greater price or charge than said city *** charges and collects of consumers within its limits through meters for like large quantities." (Ill. Rev. Stat. 1989, ch. 42, par. 348.) Chicago charges plaintiffs the same metered rate as it does the in-city, metered users of like large quantities and therefore does not violate section 26 on its face. In *Niles I*, however, this court held that section 26 does not bar the action as a matter of law, and we acknowledged that the allegations of plaintiffs' complaint stated a cause of action because, in a motion to dismiss, all well-pleaded facts are taken as true. (*Niles*, 82 Ill. App. 3d at 67-68, 401 N.E.2d at 1243.) We further held that to sustain its burden of proof at trial plaintiffs would be held to the very high burden of showing that the presumptively valid rates were in fact arbitrary and unreasonable. We stated that "plaintiffs must not only prove that they are a separate class of customers, but must also establish that the rates fixed by ordinance in 1973 and 1976 were and are unreasonable as applied to them." 82 Ill. App. 3d at 71, 401 N.E.2d at 1242.

In this appeal we are asked to overturn the trial court's decision as being against the manifest weight of the evidence. Because of the technical nature of the rate-making process, the trial court necessarily relied to a large extent on the expert opinion testimony that was of-

fered. The court assessed the expert witnesses' credibility, the facts upon which they made their calculations, and their underlying assumptions. The scope of appellate review is limited accordingly.

I

BURDEN OF PROOF

■ Plaintiffs argue that the city's water rate ordinance is not due any presumption of validity and that Chicago had the burden of proving the reasonableness of its rates. They do not, however, directly respond to this court's previous statement, in *Niles I*: "A presumption of validity is accorded the rates enacted by city ordinance, and plaintiffs bear the heavy burden of proving that the rates charged are unjustly discriminatory and unreasonable." (*Niles*, 82 Ill. App. 3d at 71, 401 N.E.2d at 1242.) In fact, the record indicates that at trial they conceded the presumptive validity of the ordinance, arguing that "clear and convincing evidence" properly states their burden of overcoming the presumption and citing *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 349 N.E.2d 399. That case expressly states the "fundamental principle" that ordinances are presumptively valid and the burden of proving their invalidity "rests upon the party attacking the ordinance." 64 Ill. 2d at 66, 349 N.E.2d at 412.

■ In *Niles I*, we recognized that the "gist of the action is plaintiffs' allegation that the rate charged the suburban users is discriminatory and unreasonable. Plaintiffs argue that they are a unique class of water users * * *. This is a constitutional challenge, and it is fundamental that a statute should be read in consonance with constitutional principles." (*Niles*, 82 Ill. App. 3d at 67, 401 N.E.2d at 1240.) If the fundamental challenge is that plaintiffs have been unfairly discriminated against in terms of their classification under the law, the standard of reviewing the statute is whether any set of facts may reasonably be conceived which would justify the classification. *E.g., Friedman & Rochester, Ltd. v. Walsh* (1977), 67 Ill. 2d 413, 418-19, 367 N.E.2d 1325; *Austin View Civic Association v. City of Palos Heights* (1980), 85 Ill. App. 3d 89, 97, 405 N.E.2d 1256 (the rational basis test).

■ This case does not involve a suspect class or fundamental right. As the trial court found, the party asserting unconstitutional discrimination resulting from a classification scheme has the burden of showing that the scheme has no rational relationship to a legitimate legislative purpose. This translates to the courts' use of minimal scrutiny in reviewing the classification. (*Austin View Civic Associa-*

*tion v. City of Palos Heights* (1980), 85 Ill. App. 3d 89, 405 N.E.2d 1256.)[1] Other courts have described the standard in rebutting the presumption of validity of an ordinance as "a clear and affirmative showing that [the ordinance] is unreasonable, oppressive, arbitrary, capricious or unnecessary." *McDonald Mobile Homes, Inc. v. Village of Swansea* (1977), 56 Ill. App. 3d 759, 763-65, 371 N.E.2d 1155, 1157 (sewer rate classifications).

■ We conclude that the trial court did not apply an incorrect standard in reviewing Chicago's ordinance in the first instance. Because it is plaintiffs' "heavy burden" to overcome the presumptive validity of the ordinance, it follows that they must also demonstrate that the rates charged them are discriminatory, unreasonable, or arbitrary, by a clear and affirmative showing. If it were Chicago's burden to prove the reasonableness of its rates in the first instance, the presumptive validity of the ordinance would be nullified. Nevertheless, Chicago did produce affirmative evidence of the reasonableness of its rates. *Cf. Bobrowicz v. City of Chicago* (1988), 168 Ill. App. 3d 227, 522 N.E.2d 663 (holding that Chicago's 50% surcharge on water sales to nonresident consumers violated its common law duty not to charge unreasonable or discriminatory rates to those customers to whom the city had undertaken to provide water), *appeal denied* (1988), 122 Ill. 2d 570, 530 N.E.2d 239.

### RELEVANCE OF CASES DECIDED UNDER THE PUBLIC UTILITIES ACT

■■■ We note here that municipally owned utilities are expressly excluded from the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 3—105(1)). The Act provides extensive regulation for privately owned utilities, and the Illinois Commerce Commission takes an active role in rate making. (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 142, 510 N.E.2d 865.) While cases decided under the Act may well be persuasive on a number of issues, the exclusion of municipal utilities from the comprehensive regulatory

---

[1]*Austin View* distinguished between the rational basis test and the common law right to be free from unreasonable discrimination in water rate cases. The court viewed the rational basis test as one involving questions of law for the court to apply while the common law test of reasonableness raises issues of fact. The court acknowledged the similarity of the tests but held that questions involving the reasonableness of rates generally should not be determined without an evidentiary hearing.

Since the trial court in the pending case expressly found that Chicago's water rates were reasonably related to the cost of serving the suburbs and did not unreasonably discriminate against them, the common law test was satisfied in determining the ultimate validity of the rates under the evidence.

scheme implies that the legislature did not intend for the wholesale adoption of public utilities principles in the review of municipal rate cases. A municipal corporation does not operate its utilities with the same profit motive as does Commonwealth Edison or Peoples Gas, for example. A municipality acts primarily in a governmental capacity and that gives support to the presumptive validity of its ordinances as proper exercises of its police powers. When, in a secondary role, the municipality acts as a proprietor—here, selling water to the suburbs—the decisional law does recognize that the municipality may realize a return or "profit" on its water facilities (see *Niles I*) but nevertheless requires that the rates themselves be reasonable. (*Niles*, 82 Ill. App. 3d at 67, 401 N.E.2d at 1239-40 ("[A]t common law, the standard of reasonableness has always been applied in evaluating the utility rates charged by municipal corporations acting in their proprietary capacities"); *Austin View Civic Association v. City of Palos Heights* (1980), 85 Ill. App. 3d 89, 405 N.E.2d 1256.) Not every discrimination is unreasonable, and the question of reasonableness is generally a question of fact. See *Conner v. City of Elmhurst* (1963), 28 Ill. 2d 221, 190 N.E.2d 760; *Austin View*, 85 Ill. App. 3d 89, 405 N.E.2d 1256.

The Illinois Supreme Court has noted that under the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 1—101 *et seq.*), rate making is a legislative function. (*E.g., People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 142, 510 N.E.2d 865; *Du Page Utility Co. v. Illinois Commerce Comm'n* (1971), 47 Ill. 2d 550, 557-58, 267 N.E.2d 662.) The court in *Hartigan* commented on the active role of the Commerce Commission, stating, "The Commission is not merely an arbitrator between a utility seeking a rate increase and any parties who happen to oppose it. Rather, the Commission is an investigator and regulator of the utilities ***." *Hartigan*, 117 Ill. 2d at 135, 510 N.E.2d at 871.[2]

As the trial court remarked, it did not have available to it the administrative staff and expertise of the Illinois Commerce Com-

---

[2]Until recently, costs of new construction incurred by a regulated utility were presumed to be reasonable. The Public Utilities Act has been amended to provide that costs associated with the construction of a power plant may not be included in a utility's rate base unless they are reasonable, a determination that is for the Commission to make with the aid of an audit procedure. (See *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865, *aff'd in part after remand* (1990), 202 Ill. App. 3d 917.) There is no counterpart rule that replaces the presumptive validity of Chicago's rate ordinances, nor is the city required to submit requests for rate increases to a commission for investigation and approval. Therefore, the Act does not constitute authority for switching the burden of proving the reasonableness of the water rates in this case to Chicago.

mission. We acknowledge that there may be many valid reasons for excluding municipally owned utilities from the extensive regulation of the Public Utilities Act, but this exclusion obliges the courts to review rates without benefit of an administrative commission's experience and fact finding. The trial court in this case was obliged, in essence, to sit as a judicial commerce commission. This in turn affects the scope of our review. See *Hartigan*, 117 Ill. 2d 120, 510 N.E.2d 865 (an order of a rate-making commission is considered *prima facie* reasonable and the burden is on the appellant to establish otherwise).

APPELLATE REVIEW

■ Because we have found that the trial court employed the appropriate standards for reviewing the challenges to Chicago's water rates, we must determine, under basic appellate principles, whether the trial court's findings of facts are supported by the evidence, deferring to that court's assessment of witness credibility and weight to be given the evidence. Our review is not *de novo*; we can only reverse if the court's findings and conclusions are palpably erroneous, arbitrary, or unsupported by the evidence. See *In re Application of County Collector* (1978), 59 Ill. App. 3d 494, 499, 375 N.E.2d 553 (for a judgment to be against the manifest weight of the evidence an opposite conclusion must be clearly apparent).

## II

■ The first issue that plaintiffs raise on the merits concerns the appropriate methodology for setting water rates. The two methods in issue are termed "cash basis" and "utility basis." Plaintiffs concede that both methods are recognized by the American Water Works Association (AWWA). This organization publishes a water rates manual that gives guidelines for the preparation and evaluation of water rates by water utilities. (See AWWA Water Rates Manual (3d ed. 1983).) According to the manual, under either method the total operating revenue requirements must be determined for the period in which the rates are to be effective. The total revenue requirements, which are based on costs of service, should be similar under either method. The main difference in the two methods, at least in the context of this case, is the utility method's inclusion of a rate of return based on the value of the physical plant. Plaintiffs strongly object to the city's use of this method over the cash basis, which Chicago has employed historically.

■ Cash basis accounting determines basic revenue requirements by adding up operation and maintenance expense, debt service

requirements, and capital expenditures that are not debt financed. Utility basis rate calculation includes in the computation of total revenue requirements the operation and maintenance expense, taxes, depreciation expense, and a return on a rate base. The rate base consists of the value of the utility plant—the actual property used and useful in serving the customers.

■■ As part of their challenge to the utility method, plaintiffs object to the court's consideration of the "fair value" concept for valuing the physical plant. Fair value includes in its calculation replacement cost new, less depreciation. Plaintiffs advocate the use of original cost only, less book depreciation. They maintain that fair value and the utility method should not have been approved in the pending case, largely because they do not believe Chicago is entitled to a return on facilities that they say have been fully paid for through the water fund, which in itself consists of the payments made by plaintiffs and other users in the system. In other words, by paying their water rates, plaintiffs assert that they are "owners" of the physical plant. As such, they should not be "surcharged" a rate of return on their own plant. Chicago, they assert, has not contributed its own capital or otherwise undertaken any risk of ownership because the fund makes the system self-sustaining.

PROPRIETY OF USING UTILITY BASIS

■■ ■ No statute specifies which rate calculation method is preferable for use by municipalities in setting water rates. Illinois courts consistently have held that utility rates should include a reasonable return on the basis of the fair value of the utility property, specifically in the case of utilities regulated by the Illinois Commerce Commission pursuant to the Public Utilities Act. (*E.g., Union Electric Co. v. Illinois Commerce Comm'n* (1979), 77 Ill. 2d 364, 396 N.E.2d 510.) In *Union Electric* the court reviewed the history of the fair value concept and rejected the Illinois Commerce Commission's attempt to use original cost only in determining value to be included in the rate base. The court rejected the argument plaintiffs make here, that the "original cost/prudent investment" method should be adopted in Illinois (despite longstanding precedent supporting fair value) because the majority of jurisdictions have adopted the original cost/prudent investment rate base method. The *Union Electric* court explained that the fair value of public utility property is a "value" concept, not a cost concept which reflects the amount of capital invested. 77 Ill. 2d at 377, 396 N.E.2d at 516.

■■ ■ We are not persuaded to ignore *Union Electric's* ration-

ale in favor of plaintiffs' position in this case. *Union Electric*, as far as we can determine, has not been overruled, by legislative amendment or otherwise. As the court explained in that decision, fair value is not the equivalent of *either* reproduction cost or original cost, but instead a combination of factors. It is a complex concept that is a part of Illinois law regardless of its acceptance in other circles. Plaintiffs respond to the decisional authority for fair value by arguing that, since municipalities are excluded from the Public Utilities Act, the cases decided thereunder are inapplicable. Inconsistently, however, they rely on an amendment to the Public Utilities Act, which allows (but does not require) the Commission to base its value determination on original cost instead of fair value. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—210.) They urge us to follow suit and decide that Illinois "is and should be an original cost/prudent investment state." We do not agree with plaintiffs that the Illinois cases employing fair value constitute a "chain of misguided precedent" that has been broken by the legislative amendment to the Public Utilities Act. Moreover, the fair value concept has been cited approvingly by the more recent water rates manual published by AWWA.

▪ Both parties, and the court, used the water rate manuals published by the AWWA to support their respective positions or conclusions. As plaintiffs must concede, the use of the utility basis is acceptable under AWWA principles. The foreword to the third edition (1983) of the AWWA Water Rates Manual notes dramatic changes in economic conditions since the 1972 edition, which have had "a far-reaching influence on water utility operational and financial management." It speaks of short- and long-term revenue stability and notes: "The basis for the initial charges and rate of return, as referred to in this manual, must reflect anticipated future conditions as well as historical costs. It follows that the financial health of the utility should be a primary objective of the rate system used and of equal concern with equitability among consumers. *** *Development of a rate base that appropriately considers fair value as well as original cost is essential. Establishment of a rate base solely on original cost less depreciation without considering all elements of value may result in inadequate revenue to meet future needs.*" (Emphasis added.) (AWWA Water Rates Manual at iv (3d ed. 1983).) See also *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1953), 414 Ill. 275, 290, 111 N.E.2d 329, 337 (rate base for public utilities properly includes fair value of the property in service, which includes "original cost of construction, the amount expended in permanent improvements, the present cost of construction, the probable earning capacity of the

property under the particular rates prescribed by statute, and the sum required to meet operating expenses"); *cf. Killarney Water Co. v. Illinois Commerce Comm'n* (1967), 37 Ill. 2d 345, 226 N.E.2d 858 (plant fair value for rate-fixing purposes does not include consumers' contributions in aid of construction).

In light of the AWWA's recognition of fair value as a legitimate concern (and its approval of the utility method), we cannot say that the trial court abused its discretion in accepting the city's use of the utility method. We disagree with plaintiffs' assertion that the court held that *only* the utility method is proper; the record does not support this statement.

Moreover, the trial court's detailed findings, well supported by the record, set forth the specific evidence the court relied on, including the fact that the city's expert, William H. Richardson, conducted a valuation study of the water system, actually inspecting the facilities themselves to verify that they were in use and to determine their condition. Richardson calculated both the original and replacement cost valuations in his calculation of the fair value, net plant investment of the facilities allocated to suburban customers, using 50% original cost, less depreciation, and 50% replacement cost new, less depreciation. In contrast, plaintiffs' expert, Edward A. Cecil, only valued the utility at its original cost, less book depreciation. Cecil did not inspect the plant and did not determine the actual accrued depreciation. He did not determine the physical condition of the facilities. In fact, his utility basis analysis does not include the fair value determination in developing a rate base.

We shall return to the experts' divergent approaches and conclusions in section III of this opinion, which focuses on the reasonableness of the rates, as determined by cost of service analysis. At this point, however, we must reject plaintiffs' opening challenge to the use of the utility basis (and the fair value component included in calculating a reasonable rate of return). Neither the record nor the pertinent authorities compel the use of the cash basis method in the pending case. Although plaintiffs cite reasons why they believe the cash basis is *preferable*, our opinion as to the relative merits of the two methods is irrelevant. Moreover, it is not the theory so much as the application of the methods that has fomented the controversy here. We find only that the trial court did not abuse its discretion on this point and that the evidence and law support use of the utility basis methodology.

THE QUESTION OF OWNERSHIP

As plaintiffs point out, the water fund has accumulated a substan-

tial surplus. Capital improvements to the system have been funded from this surplus, as are all other expenses incurred. This would seem to be consonant with the goal of making the system financially healthy and ready to meet future needs. Plaintiffs, however, imply that the surplus only underscores *their* overpayment. They do not believe that Chicago should realize *any* rate of return on the utility because the city has not invested its own funds or otherwise borne any financial risk in developing the water system, including the securing of necessary revenues to meet funding for capital improvements. Therefore, they contend, they are equitable owners of the system along with the city.

The question of who "owns" the water system, or more accurately, the physical plant, relates to the question of whether the city may receive a reasonable rate of return on its investment in the water system. If we find plaintiffs to be "co-owners," presumably we would disallow Chicago's recovery of any rate of return from the facilities that serve the suburbs because an owner is not charged a rate of return on its investment.

■■ It is true that the city's corporate funds have not been used to pay for the operation of the system. It may be true that all users have paid in enough money that Chicago has not been required to contribute additional sums for debt retirement. That does not mean, however, that suburban users become owners of the system simply because they pay the rates charged by Chicago. See *Board of Public Utility Commissioners v. New York Telephone Co.* (1926), 271 U.S. 23, 32, 70 L. Ed. 808, 813, 46 S. Ct. 363, 366 ("Customers pay for service, not for the property used to render it. *** By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company") (holding that customers had no right to compel telephone company to make up deficiencies in future net earnings out of depreciation reserves accumulated in the past); *cf. Du Page Utility Co. v. Illinois Commerce Comm'n* (1971), 47 Ill. 2d 550, 267 N.E.2d 662, *cert. denied* (1971), 484 U.S. 832, 30 L. Ed. 2d 62, 92 S. Ct. 74.

■■ State law *requires* Chicago to provide water from Lake Michigan to communities within the boundaries of the MSD at rates that are not to exceed the amounts charged to in-city, metered users of like large amounts. (Ill. Rev. Stat. 1989, ch. 42, par. 348; see *City of Chicago v. Town of Cicero* (1904), 210 Ill. 290, 71 N.E. 356.) The law further requires Chicago to provide its water service at reasonable rates, and it is true that those rates have helped build an efficient, financially sound water system. Nevertheless, plaintiffs are not

responsible for the management and continued operation of this vast system; Chicago is.

■■ The physical plant and purification operations in Chicago make available large quantities of water to suburban municipalities. As we noted in *Niles I*, municipalities act in their proprietary capacity, as opposed to their governmental capacity, when selling water to nonresidents. (*Niles*, 82 Ill. App. 3d at 68. See also *Inland Real Estate Corp. v. Village of Palatine* (1982), 107 Ill. App. 3d 279, 283, 437 N.E.2d 883.) Distinctions between privately and municipally owned utilities do not, in our opinion, require municipalities to forego a reasonable return for providing service to suburban users. It is true that privately owned concerns must turn a profit to justify the investment, while municipally owned utilities exist for reasons other than turning a profit. Nevertheless, the AWWA's Water Rates Manual expressly recognizes that a city providing water to customers outside its corporate limits appropriately uses the utility basis in determining rates because that situation is similar to the relationship of an investor-owned utility to its customers. "In this situation, the publicly owned utility, like an investor-owned utility, is entitled to a reasonable return from non-owner customers based on the value of plant required to serve those customers." AWWA Water Rates Manual, at 3 (3d ed. 1983). See *Austin View Civic Association v. City of Palos Heights* (1980), 85 Ill. App. 3d 89, 405 N.E.2d 1256.

We agree with the trial court that Chicago owns and operates all facilities in the city water system that are used in providing water to plaintiffs. The water enters the system at intake cribs located in the lake and flows through tunnels to one of two purification plants where it is filtered. It then flows through land tunnels to pumping stations, where it is pumped into the city's water distribution system. The distribution system consists of feeder (transmission) mains and grid (distribution) mains that are used in delivering water to the plaintiffs. The city holds title to these facilities, with the attendant liabilities and obligations. The city issues water revenue bonds as well. Since Chicago owns and operates this system, which provides the service to the plaintiffs, the law allows it to realize a "reasonable revenue surplus or profit." *Niles*, 82 Ill. App. 3d at 68, 401 N.E.2d at 1240.

■■ We conclude, moreover, that the ownership issue is a *non sequitur*, since plaintiffs and in-city, metered users pay the same amount for their services and any resulting surplus remains to benefit the entire water system. The city is not taking the money for its own, separate use, as the owners or shareholders of regulated utilities are

entitled to do. Instead, the money in the water fund is used to pay operating and administrative expenses as well as needed capital improvements. Money that accumulates in the fund, whether termed profit, surplus, return or reserves, has been paid in by both city and suburban customers and is available for the benefit of the whole system. Therefore, Chicago is not being unjustly enriched at the plaintiffs' expense.

### PLAINTIFFS AS A SEPARATE RATE-MAKING CLASS

 Somewhat inconsistently with their claim to "owner" status, plaintiffs also argue that they are entitled to a discount based on their status as customers who purchase large quantities of water for resale. Much of their case is premised on the assumption that the suburban municipalities are a unique class of water users with respect to the amount of water purchased, the type of service received, and the cost of that service to the city. By proving that they are a discrete class of users, plaintiffs would attempt to show that they have been unfairly discriminated against in the rates charged them. As part of this argument, plaintiffs maintain that the city's uniform rate system (consisting of only the flat, assessed rate and the metered rate) actually discriminates against them by not allowing for a large quantity discount.[3]

This argument is not supported by the evidence of record. As the trial court found, Chicago

> "provides the same basic water service to the plaintiffs as it provides for water customers within the city: a constant supply of purified water is furnished at a single metered rate.
>
> The plaintiffs as a group share similar water use characteristics with a number of large water users in the city, including such characteristics as amount of water received; use of reservoirs, air gaps, and pumping facilities; maintenance of distribution systems; and resale of water through meters."

 The record reveals that large water users in the city, like plaintiffs, maintain receiving reservoirs or tanks, air gaps to prevent back-flow between their systems and their connections to the city water system; and their own water pumping equipment. Examples of in-

---

[3]Plaintiffs suggest that the legislature intended a wholesale discount to apply to purchasers of large quantities of water. They cite no authority for this, however, and we find nothing in the Act that requires a municipality to reduce water charges to its customers as their consumption increases. While such a practice may be considered desirable from a rate-setting standpoint, we do not conclude that Chicago's uniform rate is void as being arbitrary and discriminatory.

city large water users include O'Hare Airport, Republic Steel, the Merchandise Mart, Marshall Fields, and others. Plaintiffs failed to present evidence that would distinguish themselves from these in-city users, such as materially different water flow patterns or costs of service. Because the statute only requires that the city not charge the suburban municipalities rates "in excess" of those charged in-city users of like large amounts, plaintiffs fail to establish how they have been discriminated against as a *separate class* of water users.

As a related point, the court found that plaintiffs did not establish sufficient service characteristics with each other that would compel their inclusion in a single rate class. The costs to the city of serving particular suburbs varies. The plaintiffs are served by different filtration plants, tunnel zones, and pumping stations in Chicago. Their distances from Lake Michigan and from the city limits and their connections to feeder mains and to grid mains also vary significantly. As an example, Calumet City, which is located south of Chicago, is served by different facilities than is Norridge, which is located to the northwest of the city. Each is supplied by different lake cribs, filtration plants, pumping stations and distribution systems. Their water use patterns are different.

To be classified as a single rate class it was incumbent upon plaintiffs to establish that such varying service characteristics among them did not result in costs of service that differed significantly from one plaintiff to another. The trial court's finding, that they did not prove themselves to be a discrete rate class, is not against the manifest weight of the evidence.

HISTORICAL ACCOUNTING PRACTICES

Plaintiffs contend that since Chicago historically used the cash basis to determine its total revenue requirements, it cannot now use the utility basis for figuring its costs of service to outside-city customers. We do not agree that the historical use of one method of calculation inveighs against the use of another when appropriate. In the pending case the trial court expressly found that the city's rate expert used a more accurate method of determining revenue requirements. Richardson identified the actual facilities used in providing service to the suburbs. Unlike the plaintiffs' experts, he did not assume that the revenues the city received equalled the total revenue requirements.

Calculation of total revenue requirements, as both sides agree, is critical in rate making because the rates charged must reflect the costs of service. When the reasonableness of the rates is challenged, as in the pending case, the challengers must demonstrate

convincingly that they are being charged a discriminatorily high rate or one that exceeds the cost of service to the point of unreasonableness. If the rates charged are found to be reasonably related to the cost of service, the plaintiffs necessarily fail to carry their burden of proof. The heart of the case before us, therefore, is whether plaintiffs' evidence sufficiently established that Chicago charged them rates that were so unrelated to the cost of service that they cannot stand.

## III

### REASONABLENESS AS MEASURED BY COST OF SERVICE

The trial court held that, under the evidence, the rates Chicago charges the plaintiffs are justified by the cost of service to them. The court also found that Chicago did not realize an excessive rate of return. In making this finding the court stated that it "considered all of the evidence, but in particular the cost of service studies prepared by the expert witnesses offered by the parties."

In its opinion, the court found plaintiffs' expert, Edward A. Cecil, "only marginally qualified" as an expert on water rates and held that his opinions were weakened by "numerous assumptions which were unsupported by or inconsistent with the evidence" and because his methodology in determining cost of service differed from the methods recommended by AWWA and approved by the courts. Chicago's expert, William H. Richardson, was found "qualified as an expert on the determination of water rates by virtue of extensive experiences in performing valuations of water works; preparing water rate studies; [and] testifying on water rates." The court found his opinions to be credible because the premises on which he based his cost of service study were reasonable and conservative, and in conformance with the AWWA recommendations and court decisions.[4]

The trial court next commented that plaintiffs and their expert wrongly assumed that plaintiffs represented an appropriate rate class. Plaintiffs did not offer evidence establishing that the service to the suburbs differed materially from the service provided to large water users in the city. Such service characteristics would include demand patterns or costs of service. Plaintiffs did not show, moreover, that they shared sufficiently similar service characteristics to justify a single rate class in and of themselves. Furthermore, Cecil's rate study

---

[4]The trial court stated that it took into account, in determining Richardson's credibility, the fact that his firm had performed engineering services for Chicago's water department.

did not determine the cost of serving individual plaintiffs or plaintiffs as a class. Instead, he attempted to identify a water rate common to all suburban customers, without showing that their service characteristics were so similar as to justify treating them as a single, unique rate class. Since plaintiffs bear the burden of proving that the rate charged to them are excessive and discriminatory, they would need to first establish that they constituted a single rate class. They did not.

Richardson's cost of service study did treat the suburban customers as a single rate class, not to prove that they were a separate class of wholesale customers, but to demonstrate that the rates charged to them was not excessive or discriminatory in any event.

The goal of the cost of service analysis in this case was to identify the revenue requirements for water service to the suburbs. The parties took differing approaches on this issue, and the trial court found that Chicago's expert, Richardson, analyzed the revenue requirements more accurately than did plaintiffs' experts.

BATTLE OF THE EXPERTS

Plaintiffs' main rate expert, Cecil, assumed that the revenues *required* by the water system in a given year equalled the revenues that were actually *received* in that year. He then allocated this total revenue figure between the city and suburban customers on the basis of broad formulas, without reference to the actual facilities used in service to the suburbs. The trial court found that his approach was inconsistent with the methods recommended by AWWA and approved by decisions of Illinois courts. Unlike Richardson, Cecil did not include all of the cost components necessary to calculate required revenue for developing, operating, and maintaining the water system. The trial court found that Cecil did not make a proper determination of revenue requirements either for the system as a whole or for suburban customers. He did not add up necessary costs to arrive at a revenue requirements figure. Instead, he subtracted from revenues only two cost components: operating expenses and debt service (defined as principle and interest payments on existing debt only, with no provision for payments to debt service reserves or for coverage on bonded debts). This difference he termed "margin," and it was from such margin that debt service reserves, capital expenditures not debt financed, and similar expenses were to be paid. The trial court found "Cecil's error was clearly evidenced by the fact that his calculations resulted in deficits and negative 'margins' in some years." Such deficits indicate that even by his calculation, the revenues collected in those years did not meet the actual requirements.

■■■ We cannot say that the trial court's assessment of Cecil's expert opinion was incorrect or against the manifest weight of the evidence. Since both sides agree that total revenue requirements are critical to the rate-setting determination, how these requirements are calculated is essential to their credibility. In *Niles I* we held that a reasonable rate would be one which would fully compensate the city for the cost of serving suburban users. (*Niles*, 82 Ill. App. 3d at 67.) See *Citizens Utilities Co. v. O'Connor* (1984), 121 Ill. App. 3d 533, 538, 459 N.E.2d 682; see also Ill. Rev. Stat. 1989, ch. 24, par. 11—117—12 (charges for municipal services "shall be sufficient at least to bear all cost of maintenance and operation, to meet interest charges on the bonds and certificates *** and to permit the accumulation of a surplus *** to meet all unpaid bonds or certificates at maturity").

The trial court next found that, in contravention of Illinois law, Cecil did not provide for a fair rate of return on the rate base. (See, *e.g., Union Electric Co. v. Illinois Commerce Comm'n* (1979), 77 Ill. 2d 364, 396 N.E.2d 510; *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1953), 414 Ill. 275, 286-88, 111 N.E.2d 329.) His approach failed to identify the facilities used and useful in service to the suburbs. Instead, the trial court noted that Cecil "allocated cost components among several broad functional categories and then used simple formulas to allocate the functionalized cost between city and suburban customers. There is no basis in the record for assuming that such a generalized approach bears any relation to the actual cost of service incurred by the city." In brief, Cecil separated all costs into four categories: (1) supply, treatment, and pumping; (2) transmission and distribution; (3) metering and collection; and (4) drainage, maintenance and operation. The fourth category, which relates to the city sewer system, was allocated to the city alone. Cecil then used an allocation factor to adjust the costs of the first three categories between the city and suburban users.

Richardson, on the other hand, identified the specific facilities that the city water system uses in providing service to the suburbs, including the intake cribs, purification plants, the tunnels, the pumping stations, and the transmission mains and valves. The court further found Richardson's approach to be "conservative" because he also could have taken into consideration additional pumping stations, mains, and fire hydrants.

■■■ The record indicates that Richardson not only identified the facilities in service to the suburbs, but he also verified the accuracy of the Chicago water department's fixed asset books and records and inspected the plant itself. He then developed the fair value of the Chi-

cago water system property in service by calculating both its original cost less depreciation and its reproduction cost new, less depreciation. This accords with Illinois common law, which requires both original cost and reproduction cost to be considered in determining a fair value rate base, along with other factors. See *Union Electric Co. v. Illinois Commerce Comm'n* (1979), 77 Ill. 2d 364, 369-70, 396 N.E.2d 510.

In its review of the cost of service analyses, the trial court considered a number of other matters, such as suburban demand factors, water losses in the system, operating expenses of the physical plant, administrative costs, and depreciation. We need not review these factors in detail because the trial court's written findings and conclusions are thorough and supported by the evidence. Here again the trial court found that Richardson's analysis was better supported by the relevant data and premises. For example, the city introduced water flow data, in the form of Pitometer water flow tests, which measure the relative demands of suburban and in-city users during peak times.[5] Richardson adopted a conservative suburban/city demand ratio that the trial court found proper to consider in the cost of service allocations to the suburbs. Cecil, on the other hand, did not determine the suburban demand factor by offering water flow data; instead, he simply assumed that the water demand patterns of suburban and in-city customers were exactly the same. While plaintiffs argue on appeal that the suburban demand factor is unnecessary to the cost of service analysis, and that the suburbs actually benefit the water system by evening out demand factors, the trial court held that Cecil's approach was inconsistent with the AWWA recommendations and with Illinois law.

The parties also disagreed as to the method for allocating operating expenses to the suburbs. Richardson identified the specific facilities used in providing service to the suburbs and their particular operating expenses. Cecil instead used a functional cost approach to allocate overall system expenses between the city and suburban customers. The trial court found Richardson's method to be more precise and accurate.

This pattern of divergent expert methodologies continued. Richardson's depreciation calculation included inspection of the actual

[5]Pitometer Associates, which the city characterizes as "a national consulting engineering firm specializing in the study of water distribution systems," performed tests to determine demand ratios. Peak rates of use are expressed as a ratio of the maximum rate of use to the average annual rate of use.

facilities used in service to the suburbs; Cecil used his generalized, functional cost approach.

 It is clear from the trial court's findings that the court believed Richardson's analysis to be more accurate and credible because of its relation to the actual condition of the facilities and its closer adherence to AWWA recommendations and Illinois law. In contrast, the court believed Cecil's function-cost approach was overly simplistic. Both the 1972 and 1983 editions of the AWWA Manual note that the functional cost method "has not had wide acceptance in recent years" because of "the extent-of-judgment factor application required as a basis for cost allocation." (AWWA Water Rates Manual, at 16 (2d ed. 1972); AWWA Water Rates Manual, at 22 (3d ed. 1983).) The more recent edition further notes that the functional cost approach fails to recognize that major portions of cost are related to demand or capacity. AWWA Water Rates Manual, at 22 (3d ed. 1983).

QUESTIONS OF CREDIBILITY

Plaintiffs vigorously challenges Richardson's credibility on the basis of testimony he gave in a rate-making case in Dallas, Texas. They cite his Dallas testimony as impeaching the opinions he rendered in the pending case. For example, he testified in Dallas that reproduction cost new might be appropriate for a private utility, rather than a municipality, but that depreciated original cost is the "predominately used method in the United States." He noted that fair value is used in 10 States and that even Illinois, which he termed a "fair value" State, is "leaning heavily on the depreciated original cost for fair value."

 We do not find this testimony to be impeaching on any material issue. It is not his opinion but that of the Illinois Supreme Court which determines whether Illinois is a "fair value" State. (*Union Electric Co. v. Illinois Commerce Comm'n* (1979), 77 Ill. 2d 364, 396 N.E.2d 510.) We have previously rejected the attack on the fair value component of the utility basis method for setting rates.

Plaintiffs further argue that Richardson's testimony in the two cases is irreconcilable because he recommended that the Dallas rates be determined under the cash basis method, unlike his recommendation for Chicago. The record in the pending case reveals, however, that Dallas had made a commitment to serve all of Dallas County at cost, a commitment that was made when Dallas acquired all water rights in its metropolitan area, including water supplies located in suburban areas of the county.

We do not agree with plaintiffs that Richardson's testimony in fa-

vor of the cash basis method in Dallas renders his Illinois testimony incredible. Chicago does not own Lake Michigan, nor has it acquired all of the water rights in the area. By law, Chicago must supply those suburban customers in the MSD with water, not "at cost," but at a reasonable rate not to exceed that charged to its in-city, metered users of like large quantities of water. Moreover, Richardson testified in Dallas that municipalities which have not promised to sell water to outside customers at cost are entitled to set rates calculated on the utility basis method and to obtain a return on their investment. This testimony is consistent with his testimony in the pending case.

██ We have read the pertinent transcripts relevant to the Dallas testimony. Richardson's advocacy of a rate-setting method in Dallas that differs from the one he supported in Chicago does not, in our opinion, destroy his credibility. He explained at length the differences in the circumstances the two cities faced, and we note that he did not speak in absolutes in either case. Instead, he attempted to confine most of his answers to the particular water system in issue, citing general principles but also qualifying them where appropriate.

The parties' analyses began with separate premises and used different assumptions; it is hardly surprising that their conclusions had little in common. Philosophical differences aside, *plaintiffs* were charged with proving that the rates they were charged were not reasonably related to the costs of service to them. The issue is not whether, in the abstract, their theories are more logical or preferable than the city's approach.

██ Plaintiffs' grounds for recovery were based on their allegations that the water rates Chicago charges them are not reasonably related to the cost of serving them. The trial court expressly found to the contrary, relying on the city's affirmative evidence as well as deficiencies in plaintiffs' proofs. The trial court concluded that plaintiffs failed to present an analysis of the actual costs to Chicago for providing service to them or to other suburban customers. In contrast, the court found that "Richardson's cost of service study satisfactorily establishes *without any doubt* that reasonable suburban rates could be higher than those charged." (Emphasis added.) We find that the trial court carefully considered all of the evidence and arguments before making its decision. We also hold that the court's assessment of witness credibility and resolution of conflicting evidence is not against the manifest weight of the evidence. Accordingly, we cannot reverse. *E.g., V & V Cement Contractors, Inc. v. La Salle National Bank* (1983), 119 Ill. App. 3d 154, 157, 456 N.E.2d 655; *Kleidon v. City of Hickory Hills* (1983), 120 Ill. App. 3d 1043, 1053, 458 N.E.2d 931.

IV

Having determined that plaintiffs failed to prove that their water rates were unreasonable, overall, as being unrelated to the cost of service, we address their remaining challenges. Most of these challenges condemn Chicago's internal practices, such as supplying free water to certain institutions and reimbursing the city's general fund for services rendered to the water department. In plaintiffs' words, the city included in its determination of water rates charged to the suburbs "a hodgepodge of ill-conceived practices totally irrelevant to providing water service" to the suburbs.

One such "misjudgment," according to plaintiffs, is Chicago's use of an assessed, or flat, rate for unmetered water users. They cite the AWWA Water Rates Manual as critical of such flat rates because of the possibility that they "may contribute to excessive use of water with attendant higher total costs." (AWWA Water Rates Manual, at 58 (3d ed. 1983).) Plaintiffs argue that there is no incentive for water conservation or efficient water use when what the consumer is charged has no relationship to the amount consumed.

 We are not persuaded that it is the function of this court to strike down Chicago's water rates charged to the suburbs because other users in the system pay a flat rate. While water conservation is to be applauded, we will not speculate whether the flat rate actually encourages waste. The city may well increase the number of metered users in the future. In any event, all users in the system who pay metered rates have the same objection, so any perceived discrimination is between the metered and unmetered customers, not simply between the suburban customers and Chicago. Moreover, not all discrimination is prohibited. (*Niles*, 82 Ill. App. 3d 60, 401 N.E.2d 1235.) Since plaintiffs fail to demonstrate that the flat rate is fundamentally flawed, or that its discriminatory effect is limited to them alone, we decline to address this further.

 Next, plaintiffs challenge the city water department's yearly contribution to Chicago's central services general fund (general corporate fund), which is a reimbursement for various services provided to the water department. They do not, however, demonstrate why these reimbursements should not be made. The trial court found that the ordinances which set the amount of these reimbursements were presumptively valid and that plaintiffs did not show them to be improper. Examples of payments from the water fund to the general corporate fund include sums for water department employees' fringe benefits and pension expenses, and providing for judgments in the 1981 water fund budget. The trial court also found that the water fund's account-

ing policies with respect to the general corporate reimbursements had been certified by the water fund's independent auditors as conforming with accepted accounting principles applicable to enterprise funds of governmental units.

These reimbursements are for expenses and services which contribute to the operation of the entire system. The trial court held that the reimbursement formulas bear a reasonable relationship to the services and expenses in question, and we have no reason to disturb that conclusion.

■ The trial court specifically rejected the testimony of plaintiffs' expert, W. Keith Wilkins, who calculated a payment in lieu of real estate taxes to substitute for the general fund reimbursements. The court held that he was not an expert in determining the assessed value of property and that he made no allowance in his calculations for the proper payments the water fund made for the services, insurance, pension contributions, and fringe benefits for water fund employees.

We find that the evidence supports the trial court's detailed findings on Wilkins' credibility and on the issues relating to water fund reimbursements to the city's general fund.

■ Plaintiffs also protest the city's provision of free water for charitable, religious, educational, and municipal purposes within the city. We note that the city's cost of service study allocated the costs of free water and unpaid water charges on delinquent accounts entirely to in-city users. The trial court held that plaintiffs had no standing to challenge Chicago's internal practices and policies because they did not affect the cost of serving plaintiffs. Even assuming standing, the court held, plaintiffs did not prove that these practices resulted in rates that were unreasonable or excessive to them.

■ We believe that if the rates charged to plaintiffs are not excessive, there is no unreasonable discrimination. In general we will not go beyond that determination into a review of internal management practices. (See *Austin View Civic Association v. City of Palos Heights* (1980), 85 Ill. App. 3d 89, 405 N.E.2d 1256.) Plaintiffs did not establish a nexus between their own costs of service and the costs of serving unmetered customers and exempt customers in Chicago. They do assert, in conclusory fashion, that Chicago's internal policies have artificially inflated their costs. Plaintiffs also assume their standing to challenge Chicago's internal administrative decisions. (But see *McDonald Mobile Homes, Inc. v. Village of Swansea* (1977), 56 Ill. App. 3d 759, 763, 371 N.E.2d 1155, 1158 (court would not inquire into the "propriety, necessity or expediency" of a municipality's legislative de-

cision to base sewer charges on water use).) Even so, the trial court found that plaintiffs had failed to credibly identify the costs of providing these services and failed to prove that these practices resulted in excessive and unreasonable rates charged to them. We hold that the trial court's findings are not against the manifest weight of the evidence.

■ As a related matter, plaintiffs question the fact that Chicago has not collected millions of dollars from the Chicago Park District, arguing that this and other "questionable judgments made by Chicago in determining its water rates" all increase the price that the suburbs pay for water.

Again, we note that plaintiffs are in no different position than in-city users who do not directly benefit from such practices. While that does not make a questionable policy sound, it does weaken the discrimination argument.

Beyond affirming the trial court's findings based on the evidence, we offer no comment on the challenged internal policies that may affect the water system. Our restricted review of the water rates charged to the suburbs does not, in our opinion, permit an open season on Chicago's administrative policies. As the trial court found, the inquiry is limited to the ultimate reasonableness of the water rates charged to the suburbs; the court "has not attempted to determine the motives or underlying rationale for the rate ordinances," nor the "propriety, necessity or expediency of Chicago's underlying practices relative to the operation of the water system."[6]

## V

We do carve out one, specific item that we believe was inappropriately included in charges to the suburban municipalities. As the parties have stipulated, the Chicago sewer system provides no service or benefit to the suburban municipalities, although the cost of operating the sewer fund was included in the water rates set by Chicago in 1973 and 1977. Therefore, from 1973 through 1980 or 1981, the sub-

---

[6]A certain narrowness of vision may creep in if the courts are requested, in municipal utility rate cases, to evaluate a myriad of governmental practices that may seem, to some, as unwise exercises of governmental discretion. A broader view would take into account that many of Chicago's amenities, including its parks, several museums, and dozens of events, are enjoyed by large numbers of nonresidents free of charge. While we do not imply approval of Chicago's failure to collect money on a significant portion of water produced in the system, we do suggest that it is not the role of this court in this case to speculate on the rationale behind particular policies of the city.

urbs' payments included an amount to cover Chicago's sewer expenses. (In 1980 the sewer and water fund operations were separated.)

Plaintiffs' expert, Cecil, identified the cost required to operate and maintain the sewer bureau from Chicago's statistical reports for the years 1973 through 1976. For 1977 and after, he used a statistical progression to calculate a charge per 1,000 gallons of system water deliveries necessary to cover drainage, maintenance, and operation expenses for sewer service. He then figured two alternative calculations. One assumed that no sewer expenses were included in water rates after January 1, 1980. The calculation for this totaled $19,590,000 for the plaintiff "class" and $14,909,000 for the named plaintiffs. The alternate calculation extended through 1981, on the theory that the 1977 water rates (which included sewer costs) were not changed until 1981. The calculation for this extended period totaled $28,839,000 for the putative class members and $18,067,000 for the named plaintiffs.

Cecil then increased these calculated overpayments by 25%, determining that 32% of the water in the entire system produces no revenue. His prior calculations used a 15% figure to account for system losses, but he justified the higher adjustment as being more accurate, on the grounds that sewer bureau expenses could only be paid from the distribution of water for which money was received. The net effect of using the 32% figure was to inflate the suburban overpayment amount.

The city takes issue with Cecil's assumptions, arguing that they are unsupported by the evidence and even contradict the city's audited financial statements. For example, the city cites the water fund's financial statements as showing that no sewer expenses were listed thereon and argues that the relevant appropriation ordinance shows sewer expenses being paid out of the corporate fund from 1977 to 1979. The city further argues that as of 1980 sewer expenses were charged to a new sewer fund and therefore the alleged overpayments ended in that year.

The trial court found that plaintiffs had failed to prove their claim as to the sewer expenses. The court further found that, based on the city's cost of service analysis (in which no sewer charges were allocated to the suburbs), the water rates charged to the suburbs were reasonable, even conservative. Accordingly, any amounts allegedly paid as part of the sewer expense could be treated as part of the city's reasonable cost of service (or rate of return or surplus).

We believe that the sewer charge is different in kind from

the "indirect" costs of Chicago's furnishing free water or not collecting all of its accounts. In the latter cases, there is a system-wide absorption that all users bear, in-city or outside. They are similarly situated. In the case of a cost specifically attributable to sewer services, the in-city users receive a benefit that the suburbs do not. It is not an answer to assume that, because Chicago could have charged a somewhat higher rate in the first place, it should be able to submerge the sewer charge in that rate under a catch-all category called "return" or "surplus."[7]

We are not persuaded, however, that Cecil's assumptions and conclusion are sound as to the amounts in issue, and we are unable to determine from the record what amount should be refunded. Because of our conclusion that this item should be treated differently from the other challenged items, moreover, we believe that the trial court should conduct a new hearing on the issue of sewer charges alone. The parties may then bring forth whatever evidence and argument that is pertinent to this one issue. Since the validity of the rate ordinances are not in issue, the plaintiffs' burden of proof is the normal "preponderance" of evidence necessary to establish the monetary amount of the claimed overpayments. The hearing should therefore focus on the period of time in which the suburbs made the sewer payments and the amounts reasonably attributable to those payments, as determined by the parties' stipulations, the pertinent ordinances, books, records and financial statements of Chicago, and whatever credible expert testimony or accountant opinion is needed to calculate the overpayment.

We conclude that plaintiffs are entitled to recover a credit for the sewer charge in the amount supported by the evidence and on such payment terms or schedule as the trial court finds appropriate.

## VI

Plaintiffs argue that the trial court erred in failing to certify the instant lawsuit as a class action. They are 52 of approximately 84 potential class members. In addition there may well be future municipalities or other entities who will purchase water from Chicago. They argue that this court in *Niles I* established that the complaint stated a

---

[7]We emphasize that our treatment of this single item neither invalidates Chicago's rate ordinances nor transforms plaintiffs into a discrete, wholesale class for rate-making purposes. The trial court's findings on those issues remain intact. Our decision to allow what is in effect a sewer "credit" recognizes that the plaintiffs did pay for a service they did not receive, thereby subsidizing in-city customers' sewer costs for a measurable period of time.

cause of action and, since that opinion became the law of the case, the trial court erred in denying class certification when it stated that "no class action will lie when there is no underlying cause."

■■■ Plaintiffs confuse stating a cause of action with meeting the requirements for class certification. Law of the case does not require the trial court to certify a class on the grounds that a cause of action has been properly pleaded. Section 2—801 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—801) requires class certification to be grounded on these factors:

"(1) the class is so numerous that joinder of all members is impracticable.

(2) There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3) The representative parties will fairly and adequately protect the interest of the class.

(4) The class action is an appropriate method for the fair and efficient adjudication of the controversy."

■■■ We need not discuss the class certification issue at length because it is clear that the trial court concluded, on the evidence, that the suburbs are not a unique, wholesale class of customers for water rate purposes. *Niles I* does not compel a contrary conclusion; in fact, there we held that the plaintiffs must first prove they are a separate class of water users in order to recover. *Niles*, 82 Ill. App. 3d at 71.

If plaintiffs had proved the necessary service characteristics and other matters required to put them in a separate class for rate-making purposes, the certification as a class for purposes of this litigation would logically follow. Under these circumstances, however, we conclude that the trial court's refusal to certify the class was not error.[8]

## VII

As their final issue, plaintiffs challenge the validity of their contracts with Chicago, asserting that the court should have found them to be unenforceable for want of consideration because of the city's pre-existing duty to provide water service under the statute. In addition, plaintiffs request us to find that their agreements are contracts of adhesion. Chicago, on the other hand, maintains that plaintiffs

---

[8]On remand for the new hearing on sewer charges the question may again arise concerning the propriety of class certification with respect to this one issue. By our comments in this appeal we do not intend to foreclose—or advocate—class certification if the issue arises in that context.

should be estopped from refuting their voluntarily executed contracts for water service.

We have not decided this case under contract principles and indeed plaintiffs do not rest their claims on contract. Accordingly, we decline to analyze what will only add length but not clarity to the opinion.

For the reasons set forth, we affirm the decision of the trial court in all but one respect. We hold that plaintiffs failed to sustain their burden of proving that Chicago's water rates were discriminatory or unreasonable as to them. We find that the trial court's findings of fact are not against the manifest weight of the evidence. We vacate, however, that portion of the judgment which denied plaintiffs relief as to the issue of sewer costs and remand for further proceedings on that single issue.

Affirmed in part; vacated in part, and remanded.

McMORROW, P.J., and JOHNSON, J., concur.